**Affirmed and Memorandum Opinion filed October 31, 2013.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00982-CV

**G. CHRISTIAN CORCORAN AND PEGGY CORCORAN, Appellants**

**V.**

**ATASCOCITA COMMUNITY IMPROVEMENT ASSOCIATION, INC.,
Appellee**

**On Appeal from the 125th District Court
Harris County, Texas
Trial Court Cause No. 2009-41594A**

## M E M O R A N D U M   O P I N I O N

In two issues, appellants, G. Christian Corcoran and Peggy Corcoran, challenge the trial court's summary judgment in favor of appellee, Atascocita Community Improvement Association, Inc. ("ACIA"). We affirm.

# I. BACKGROUND

ACIA is non-profit corporation whose members are certain property owners in Atascocita. ACIA is governed by a board of trustees. ACIA's purpose is to maintain and preserve properties subject to covenants, conditions, and restrictions and promote health, safety, and welfare of residents. The Architectural Control Committee ("ACC") is a separate entity created to review and approve or disapprove plans for new structures and additions or alterations to existing structures in light of applicable restrictions, minimum construction requirements, and the overall character and aesthetics of the properties. The heart of this appeal concerns the relationship between ACIA and ACC.

Appellants reside in the single-family-home neighborhood of Pinehurst, Section 11, a subdivision subject to the authority of ACIA and ACC. Appellants' next-door neighbors are the Joneses. A dispute arose between appellants and the Joneses, based in part on the Joneses' desire to erect a basketball court, lighting, and other structures on their property. In March 2009, the Joneses submitted an application with ACC requesting approval to add certain structures to their property. On March 24, 2009, ACC denied the application on grounds that the proposed structures might be a nuisance, result in noise, and "do not fit into ambiance of neighborhoods." The Joneses appealed the denial to the ACIA Board. On May 19, 2009, the ACIA Board sent the Joneses a letter approving their application.

On June 30, 2009, the Joneses filed suit against appellants for defamation, nuisance, invasion of privacy, and intentional infliction of emotional distress, and sought injunctive relief. Appellants counterclaimed and asserted similar claims. They also filed a third-party action against ACIA seeking, among other relief, a declaration that ACIA lacked authority to overturn ACC's denial of the Joneses'

application. After several bouts of summary-judgment pleadings, ACIA filed a "Second Amended Motion for Summary Judgment on [Appellants'] Request for Declaratory Relief" and a supplement to that motion, seeking traditional summary judgment. The trial court granted ACIA's motion and severed from the suit all of appellants' claims dismissed by the summary judgment, rendering a final judgment on these claims.

## II. SUMMARY JUDGMENT

In two issues, appellants challenge the trial court's grant of summary judgment.

### A. Standards of Review and Construction of Governing Documents

We review summary judgments *de novo*. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156–57 (Tex. 2004). When the trial court grants summary judgment without specifying on what grounds, we will affirm if any of the independent grounds presented is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex. 2000). We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Joe*, 145 S.W.3d at 157.

A party moving for traditional summary judgment must establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). If the movant establishes a right to summary judgment, the burden shifts to the nonmovant to present evidence raising a material fact issue. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

We interpret restrictive covenants and corporate bylaws using the general rules of contract construction. *See Wiese v. Heathlake Comm. Ass'n, Inc.*, 384 S.W.3d 395, 400 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *In re Aguilar*, 344 S.W.3d 41, 49–50 (Tex. App.—El Paso 2011, no pet.). We also apply general rules of contract construction, as expressed in Texas case law, to interpret a Texas corporation's articles of incorporation. *See Highland Crusader Offshore Partners, L.P. v. Andrews & Kurth, L.L.P.*, 248 S.W.3d 887, 891 (Tex. App.—Dallas 2008, no pet.) (construing charter of Delaware corporation under ordinary principles of contract construction under Delaware law).

When construing such documents, our primary goal is to ascertain and give effect to the intent of its drafters, using the language of the documents as our guide. *See Wiese*, 384 S.W.3d at 400; *Aguilar*, 344 S.W.3d at 50. We examine the documents as a whole in light of the circumstances present when it was written, affording words and phrases their commonly accepted meanings. *See Wiese*, 384 S.W.3d at 400; *Aguilar*, 344 S.W.3d at 50. We review the trial court's interpretation of the documents *de novo*. *See Wiese*, 384 S.W.3d at 400; *Aguilar*, 344 S.W.3d at 50. A document is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). Whether the documents are ambiguous is a question of law. *See Wiese*, 384 S.W.3d at 400; *Aguilar*, 344 S.W.3d at 50. The documents are not ambiguous simply because the parties disagree over the documents' interpretation. *See Wiese*, 384 S.W.3d at 400; *Aguilar*, 344 S.W.3d at 50.

## B. Governing Documents

The summary-judgment record contains numerous documents governing ACIA over a forty-year period. In 1973, "ARTICLES OF INCORPORATION OF

4

[ACIA]" were filed with the Texas Secretary of State. Among the stated purposes of ACIA were the following:

> 1. exercise all of the powers and privileges and to perform all of the duties and obligations of [ACIA] as set forth in that certain Declaration of Covenants, Conditions and Restrictions . . . applicable to the property . . . and as the same may be amended from time to time as therein provided . . . .
>
> . . .
>
> 3. have and exercise any and all powers, rights and privileges which a corporation organized under the Non-Profit Corporation Act of the State of Texas may by law now or hereafter have or exercise . . . .

Also in 1973, the ACIA Board adopted bylaws ("the Bylaws"). Article VI of the Bylaws addressed the powers and duties of ACIA, including "to exercise such other rights and powers granted to [ACIA] under the Declaration, the Articles of Incorporation of [ACIA], or these Bylaws," and the duty to "supervise all officers, agents, and employees of [ACIA], and to see that their duties are properly performed."

In 1974, the owner of a subdivision in Atascocita executed "DECLARATION OF COVENANTS AND RESTRICTIONS," with the purpose of providing for the preservation of properties in the residential community. This document provided that the owner would cause to be incorporated a non-profit corporation, governed by a board of trustees, to enforce the covenants and restrictions—this provision referred to ACIA. The 1974 Declaration expressly provided that other subdivisions may later be "brought within the scheme of this Declaration" via supplemental declarations.

In 1983, ACIA signed "SUPPLEMENTAL DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR PINEHURST OF ATASCOCITA, SECTION ELEVEN (A RESIDENTIAL SUBDIVISION),"

bringing the subdivision that is the subject of this litigation within the scheme of the 1974 Declaration. Both the 1974 and 1983 Declarations contain similar versions of Article VIII, regarding ACC, providing that no improvements or additions shall be made to properties within the subdivisions without having been submitted to and approved by ACC. According to Article VIII, ACC

> shall have full power and authority to reject any plans and specifications that do not comply with the restrictions herein imposed or meet its minimum construction requirements or architectural design requirements or that might not be compatible, in the sole discretion of [ACC], with the design or overall character and aesthetics of the Properties.

Article VIII further provided ACC will be initially composed of a committee of three persons and

> [ACC] shall remain independent of [ACIA]. That is, [ACC] shall in no way be controlled by or obligated to approve any recommendations or requests of the membership of [ACIA]. In the event of the death or resignation of any member or members of [ACC], the remaining member or members shall appoint a successor member or members[.]

Pertinent to this litigation, article VIII, section 4 provided,

> Transfer of Authority to [ACIA]. The duties, rights, powers, and authority of [ACC] constituted hereby may be assigned at any time, at the sole election of a majority of the members of the [ACC], to the Board of Trustees of [ACIA], and from and after the date of such assignment, and the acceptance thereof by such Trustees, the Board of Trustees of [ACIA] shall have full right, authority and power, and shall be obligated, to perform the functions of [ACC] as provided herein, including the right to designate a representative or representatives to act for it.

Therefore, ACC had the express authority to assign its architectural control authority to ACIA, after which ACIA was obligated to perform ACC's functions but could designate a representative to perform this duty.

6

ACIA presented several documents, particularly from 1992, which it argues establish that ACC assigned its architectural control authority to ACIA. However, on appeal, the parties primarily focus on documents from 1997. On March 5, 1997, a single person signed on behalf of ACC a "NOTICE OF FULL ASSIGNMENT OF ARCHITECTURAL CONTROL FOR PINEHURST OF ATASCOCITA, SECTION 11" ("the 1997 Assignment"), whereby ACC purported to assign all of its rights, powers, duties, and obligations to ACIA. No other member of ACC signed, or was mentioned in, the 1997 Assignment.

Effective March 24, 1997, all members of ACIA and ACC jointly promulgated "ARCHITECTURAL GUIDELINES AND PROCEDURES" ("the 1997 Guidelines"), which applied to Pinehurst 11. The 1997 Guideless expressly replaced and superseded previous guidelines. The 1997 Guidelines begin with provisions explaining ACC's role as set out in the Declarations, including that ACC shall have discretion to approve or disapprove architectural plans. Provisions also express that the ACIA Board and ACC desire to establish procedures for submission of architectural proposals and that the "guidelines shall supplement the applicable restrictive covenants set forth in the Declarations." The 1997 Guidelines then contained the following pertinent sections:

> 240.2 RESPONSIBILITY. [ACC] and its function established in the Declaration of Covenants and Restrictions for the various subdivisions within [ACIA] was assigned by the Developer to [ACIA] for all phases of Architectural control.
>
> The Board appoints members to [ACC] and monitors [ACC's] performance through the Trustee with responsibility for [ACC]. [ACIA's] Manager provides the communication link between member property owners and [ACC] (and vise versa) and provides the administrative function for [ACC].
>
> 240.3 APPROVAL OF PLANS. No building, structure, fence, wall, or other improvements shall be commenced, erected, constructed,

placed or maintained upon the properties, nor shall any exterior addition to or change or alteration therein be made until the detailed plans and specifications therefor shall have been submitted to and approved in writing as to compliance with minimum structural and mechanical standards, location and situation on the lot, and as to harmony or external design or location in relation to property lines, buildings lines, easements, grades, surrounding structures, walks, and topography (including the orientation of the front and rear of any such building with respect to the lot lines), by [ACC.]

240.4 ARCHITECTURAL CONTROL COMMITTEE AND SUBCOMMITTEE – PROJECT REVIEW. [ACC] is composed of five members, each having a three (3) year term with no more than two (2) members['] terms expiring in any one year. As each term expires, an appointment will be recommended by the responsible Board member to the [ACIA] Board. A replacement for any person who resigns will also require approval of the [ACIA] Board to finish out the term. The five committee members, along with the responsible Board member, will select one of the committee members to be the Chairmen and two of the committee members to comprise a subcommittee called the Project Review Committee (PRC), which is responsible for physical inspection and verification that residents and home builders have followed the plans submitted and approved by [ACC] during and after the construction phase.

Section 240.5 of the 1997 Guidelines contained the following administrative procedures pertaining to how ACC reviews applications for construction approval:

- A property owner seeking to improve or modify his property submits certain forms to "the Manager" who forwards them to ACC members. "The Manager" is not defined in the document, but previous documents described the Manager as an agent of ACIA.

- The Manager generally is not to make evaluative decisions. However, the ACC chairman and the Manager are authorized to approve or disapprove applications that clearly comply or do not comply with certain restrictions and requirements.

- ACC members have specific deadlines to rule on the application. If a majority of ACC members accept the request, it is accepted, although the

ACC chairman must reevaluate projects when a member disapproves the project.

- "The Manager will advise the resident of [ACC's] disposition by means of an [ACC] DISPOSITION SHEET, following any additional or special procedure prescribed by [ACC]."

- "All disapproved requests are to have the box checked: 'If you wish additional review . . .'. Disapproved requests where construction is initiated or approved requests which have been deviated from, will become deed restriction violations[.]" However, nothing in the record elaborates on what is meant by, or what language follows, "If you wish additional review. . .".

- After approval, the property owner then has a certain amount of time to begin and complete his addition. Members of the ACC Project Review Committee are tasked with physically observing construction to ensure compliance with the approved plans.

- At the end of section 240.5 is the following provision: "Final Determination. In instances where compliance with architectural control procedures and decisions cannot be achieved, the matter shall be referred to the Board for a determination of whether or not legal action should be initiated."

There is no specific provision in the 1997 Guidelines authorizing homeowners to appeal ACC disapproval to ACIA. Furthermore, approved application forms attached to the 1997 Guidelines do not mention an ability to appeal to ACIA.

## C. Summary Judgment Disposing of Appellants' Claims

In their first issue, appellants contend the trial court erred by granting summary judgment against appellants on their claims. The parties focus on the 1997 documents, apparently because these were the last relevant documents executed before ACIA overruled ACC's disapproval of the Joneses' application. In the 1997 Assignment, ACC ostensibly assigned all of its architectural control authority to ACIA. However, appellants point out that this assignment was signed by only one member of ACC—not a majority of ACC members as required by article VIII, section 4 in the Declarations.

9

Regardless, in the 1997 Guidelines, all members of the ACIA Board and *all members of ACC* unanimously adopted the guidelines and procedures outlined therein. The 1997 Guidelines contained the following provision:

240.2 RESPONSIBILITY. [ACC] and its function established in the Declaration of Covenants and Restrictions for the various subdivisions within [ACIA] was assigned by the Developer to [ACIA] for all phases of Architectural control.

The Board appoints members to [ACC] and monitors [ACC's] performance through the Trustee with responsibility for [ACC]. [ACIA's] Manager provides the communication link between member property owners and [ACC] (and vise versa) and provides the administrative function for [ACC].

ACIA argues the first paragraph of this provision indicates that ACC's architectural control authority had been assigned to ACIA. This paragraph is confusing because it appears to say ACC's authority was transferred by "the Developer" to ACIA. The term "the Developer" is not defined, nor was "the Developer" given power in the Declarations to transfer ACC's authority to ACIA.

Nevertheless, ACIA argued in its motion for summary judgment that, via the 1997 Guidelines, the ACC board members ratified an assignment of ACC's authority to ACIA. The elements of ratification are (1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, and (3) with the intention of giving validity to the earlier act. *White v. Harrison*, 390 S.W.3d 666, 672 (Tex. App.—Dallas 2012, no pet.) A party ratifies an agreement when—after learning all of the material facts—he confirms or adopts an earlier act that did not then legally bind him and that he could have repudiated. *Id.* One may ratify the acts or contract of another, purporting to be performed or made on his behalf, whether the other was his agent and exceeded his authority as such or was not his agent at all. *Willis v. Donnelly*, 118 S.W.3d 10, 26 (Tex. App.—Houston [14th

Dist.] 2003), *rev'd on other grounds*, 199 S.W.3d 262 (Tex. 2006); *La Strada-San Felipe, Ltd. v. ATW Plumbing Services, Inc.*, No. 01-03-00547-CV, 2004 WL 1277580, at *4 (Tex. App.—Houston [1st Dist.] June 10, 2004, no pet.) (mem. op.).

It is clear in the 1997 Guidelines that ACC intended to cede its power to ACIA. As noted above, in the Declarations, ACC members were responsible for appointing their own successor members when a member died or resigned. Additionally, the Declarations expressly stated that ACC shall remain independent of, and not be controlled by, ACIA. Contrarily, the 1997 Guidelines provided that ACIA is responsible for appointing successor members of ACC and monitoring ACC, and ACIA and ACC jointly promulgated procedures for architectural control. Moreover, notwithstanding inclusion of the term "the Developer," section 240.2 indicates that "[ACC] and its function . . . was assigned by the Developer to [ACIA] *for all phases of Architectural control*." Additionally, the 1997 Guidelines state that all members of ACIA and ACC unanimously adopted the guidelines and procedures of the 1997 Guidelines.

Construing these provisions together, we conclude the 1997 Guidelines unambiguously established that ACC ratified an assignment of its authority to ACIA. In the 1997 Guidelines, each member of ACC acknowledged (1) that *all* of ACC's architectural control authority had been assigned to ACIA, (2) ACIA had power to appoint successor members of ACC, and (3) ACIA had power to monitor ACC. Given that ACC initially had full, independent power over architectural control decisions and its own membership, ACC's acknowledgments in the 1997 Guidelines are reasonably viewed as approval of an assignment of ACC's authority to ACIA. A few weeks earlier, a single person signed on behalf of ACC the 1997 Assignment in which ACC purportedly assigned "to [the ACIA Board] *all* rights

11

and powers, if any, along with the duties and obligations of [ACC] for lots within Pinehurst of Atascocita." This is the only evidence that, prior to the 1997 Guidelines, ACC attempted to assign *all* of its authority regarding the relevant subdivision to ACIA.[1] Accordingly, we hold that, pursuant to 1997 Guidelines, ACC ratified the 1997 Assignment.[2]

Appellants argue that, even if ACC ratified assignment of its authority to ACIA, the 1997 Guidelines establish that ACIA *reassigned* this authority to ACC. Appellants contend that section 240.3 (quoted above) established that ACIA "delegated exclusive and sole authority to the ACC to approve all improvements to residential lots" because the section expresses that no improvements shall be made unless "submitted to and approved in writing . . . by [ACC]." Appellants correctly assert that section 240.5, outlining procedures for ACC to review property owners' applications, did not express that a property owner may appeal ACC's decision to ACIA. Appellants also note section 240.5 ends with a provision related to the ACIA Board's right to make a final determination:

> Final Determination. In instances where compliance with architectural control procedures and decisions cannot be achieved, the matter shall be referred to the Board for a determination of whether or not legal action should be initiated.

Appellants argue the foregoing provisions establish that ACC had sole authority to

---

[1] In 1992, a single person on behalf of ACC ostensibly assigned *part* of ACC's authority to ACIA, and guidelines signed by ACC a few weeks later expressed that ACIA had received a *partial* assignment. The 1997 Assignment and 1997 Guidelines are the only documents referencing a *full* assignment of ACC's rights to ACIA.

[2] Appellants contend we may not consider ACIA's ratification ground because the trial court did not mention ratification in its summary-judgment order. However, even if the trial court limited the grounds upon which it granted summary judgment, we still may affirm the judgment on other grounds raised in ACIA's motion for summary judgment. *West Houston Airport, Inc. v. Millennium Ins. Agency, Inc.*, 349 S.W.3d 748, 751 n.2 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

disapprove the Joneses' request, and ACIA did not reserve any authority to reconsider ACC's ruling.

ACIA responds that the procedures adopted in the 1997 Guidelines did not mean ACC had sole architectural control authority, but merely meant ACC was acting as a representative of ACIA. ACIA supports this contention with article VIII, section 4 of the Declarations:

> . . . from and after the date of such assignment [on architectural-control authority from ACC to ACIA], and the acceptance thereof by such Trustees, the Board of Trustees of [ACIA] shall have full right, authority and power, and shall be obligated, to perform the functions of [ACC] as provided herein, *including the right to designate a representative or representatives to act for it*.

(emphasis added). ACIA cites the Bylaws provision providing that ACIA has the duty to "supervise all officers, agents, and employees of [ACIA], and to see that their duties are properly performed" and a provision of the 1997 Guidelines stating the ACIA Board "appoints members to the [ACC] *and monitors [ACC's] performance*." (emphasis added). ACIA also refers to section 204.011 of the Property Code, entitled "Architectural Control Committee," which provides, "the architectural control committee authority automatically vests in the property owners' association when . . . the architectural control committee assigns, in writing, authority to the property owners' association." Tex. Prop. Code Ann. § 204.011(b)(3) (West Supp. 2012).[3]

In sum, ACIA contends that when construing the 1997 Guidelines in conjunction with section 204.011(b)(3) and other provisions in the Governing Documents—particularly article VIII, section 4 of the Declarations—it is clear

---

[3] Appellants contend section 204.011(b)(3) is inapplicable because ACC never assigned its authority to ACIA. However, we have determined that ACC ratified an assignment of its authority to ACIA. Thus, section 204.011(b)(3) does apply.

ACIA merely designated ACC as an agent regarding architectural control review, but that ACIA retained supervisory authority and could veto ACC's decisions.[4]

In their brief, appellants argue ACIA had power to reassign architectural control authority to ACC because article VIII, section 4 of the Declarations gave ACIA a "*right to designate a representative or representatives to act for it*" regarding architectural control decisions. Thus, in arguing ACIA had power to reassign authority to ACC, appellants rely on the same provision which ACIA argued meant that ACC was a representative of ACIA.

We reject appellants' argument because ACIA's ability to designate a representative to make architectural control decisions does not mean ACIA had power to assign full authority to another person. This is particularly true here because the Bylaws expressly provided that ACIA had the duty to "supervise all officers, agents, and employees of [ACIA], and to see that their duties are properly performed." Appellants cite no other section in the governing documents or any statutory provision supporting their contention that ACIA had power to reassign architectural control authority to ACC.

Accordingly, ACIA did not *reassign* all of its architectural control authority

---

[4] In their opening brief, appellants assert that ACIA had power to reassign architectural control authority to ACC. In their reply brief, appellants argue we must take this assertion as true because ACIA did not contradict it. *See* Tex. R. App. P. 38.1(g) ("In a civil case, court will accept as true the facts stated [in the statement of facts section of appellant's brief] unless another party contradicts them."). We disagree because ACIA did contradict this assertion several times in its appellate brief.

Appellants also argue ACIA asserts in its appellate brief that the 1997 Guidelines were not a reassignment of architectural control authority to ACC whereas they argued in their motion for summary judgment that the 1997 Guidelines provided procedures for review of architectural-modification requests. Appellants contend ACIA has improperly reversed its position on appeal. We disagree that the portions of ACIA's trial and appellate arguments noted by appellants reflect a change in position. Moreover, ACIA has consistently maintained that it has authority to overrule ACC's decisions.

to ACC but merely designated ACC as ACIA's agent regarding such authority. Although section 240.3 of the 1997 Guidelines expresses that no architectural modification "shall be" made until approved by ACC, because ACC was ACIA's agent, ACC's decisions were made on behalf of ACIA. A primary concept of agency is that the principal has control over its agent. *See Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("An agent is one who consents to the control of another, the principal, who has manifested consent that the agent shall so act."). Contrary to appellants' position, the absence of an express provision providing ACIA power to overrule ACC's decisions does not mean ACIA lacked such control over its agent. When ACC disapproved a resident's construction plans, ACC was not binding ACIA to any agreement for which ACIA would be responsible but was simply disapproving certain plans on ACIA's behalf. We can conceive of no reason why ACIA, as the principal, did not have authority to review and overrule such a decision. *Cf. Garret v. Giblin*, 940 S.W.3d 408, 409–11 (Tex. 1997, no writ) (concluding client's (principal) decision not to file suit against doctor, despite lawyers' (agents) determination that client had a potential claim against doctor and the failure of which to bring might reduce client's recovery, precluded client from suing lawyers—client was ultimate decision maker).

Contrary to appellants' contention, the provision affording ACIA final authority to determine whether to take legal action when "compliance with architectural control procedures and decisions cannot be achieved" does not mean ACIA lacked authority to reverse ACC's denials. In fact, this provision indicates ACIA had ultimate power to disregard architectural violations, meaning a resident could maintain non-complying modifications despite ACC's disapproval if ACIA so chose. This further supports a conclusion that ACC's architectural control

decisions were not meant to be unassailable.

Finally, appellants contend language in the 1997 Guidelines providing that the ACIA Board "monitors" ACC's performance did not give ACIA any power to overrule ACC's decisions because "monitor" means "to watch, observe, listen to, or check (something) for a special purposes over a period of time." See Monitor, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/monitor (last visited October 2013). However, the Bylaws obligate ACIA to "supervise all officers, agents, and employees of [ACIA], and to see that their duties are properly performed." "Supervise" means "to be in charge of (someone or something) : to watch and direct (someone or something)." See Supervise, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/supervise (last visited October 2013). Considering these provisions in light of the nature of ACIA and ACC's agency relationship, we conclude it would be unreasonable to hold that ACIA was bound by, and without authority to overrule, ACC's disapprovals.[5] Therefore, the trial court properly determined that ACIA had authority to overrule ACC's decision regarding the Joneses' architectural projects. We overrule appellants' first issue.

## D.  Summary Judgment Awarding Attorney's Fees Against Appellants

In their second issue, appellants contend the trial erred by awarding ACIA $120,196.14 in attorney's fees. The trial court awarded ACIA attorney's fees pursuant to section 37.009 of the Declaratory Judgments Act, under which, "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code

---

[5] Appellants also argue portions of the Articles of Incorporation and Bylaws cited by the trial court in its summary-judgment order do not provide ACIA with power to veto ACC's decisions but merely recite ACIA's general powers afforded under the Governing Documents and statutes pertaining to certain corporations. We need not address this argument because we hold ACIA had authority to overrule ACC's architectural plan disapprovals under principles of agency.

16

Ann. § 37.009 (West 2012); *see also Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 405 (Tex. 2009) (expressing award of fees under section 37.009 must be "equitable and just").

Appellants do not contend the evidence is insufficient to support the trial court's finding that the fees awarded were "reasonable and necessary." Instead, appellants contend the trial court erred by determining the fees awarded were "equitable and just." We review for abuse of discretion the trial court's "equitable and just" determination under section 37.009. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004); *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). The award of attorney's fees in a declaratory-judgment action is within the trial court's discretion and is not dependent upon a finding that a party substantially prevailed. *Bank of N.Y. Mellon v. Soniavou Books, LLC*, 403 S.W.3d 900, 907 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The trial court abuses its discretion if it acts in an arbitrary or unreasonable manner. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

Appellants first contend ACIA presented no specific evidence that its attorney's fees were equitable and just nor mentioned the terms "equitable" and "just" in its attorney's fees affidavit. According to appellants, because ACIA sought fees under section 37.009 in the summary-judgment context, ACIA was required to prove *conclusively* that its fees were equitable and just. We reject this argument because, unlike the issues of whether fees are reasonable and necessary, whether fees are equitable and just are not fact issues but questions of law the trial court considers from all surrounding circumstances. *See Ridge Oil Co.*, 148 S.W.3d at 161–62; *Approach Res. I, L.P. v. Clayton*, 360 S.W.3d 632, 639–40 (Tex. App.—El Paso 2012, no pet.) ("Whether it is 'equitable and just' to award

17

attorney's fees depends, not on direct proof, but on the concept of fairness, in light of all the circumstances of the case." (citing *Ridge Oil Co.*, 148 S.W.3d at 162)).[6]

Appellants also contend the trial court's award of fees to ACIA was not equitable or just for the following reasons:

- Appellants and ACIA were both pursuing resolution of an issue that is important to all property owners subject to ACIA governance, namely, whether ACIA or ACC has final authority to approve architectural modifications. In fact, this issue is so important, that in 2012, ACIA filed a separate suit against the Joneses, partially involving the same issue as the current case, and in which ACIA is relying on ACC's decision as the final authority on disapproval of a property-modification application. Furthermore, deposition testimony from this suit proves that ACIA has informed the Joneses that ACIA will not rule on any of the Joneses' other applications until resolution of the underlying suit. Thus, by bringing this suit, appellants have actually helped ACIA resolve uncertainties.

- By seeking declaratory relief against ACIA, appellants were "pursuing a legitimate interest" by attempting to prevent "nuisance" structures from being erected in their neighborhood. At a 2011 meeting of the ACIA Board, the ACIA Board declared that late-night noise coming from the Joneses' property was a nuisance and ordered the manager to escalate pursuit of the violation. Accordingly, appellants attempted to remedy a real problem and had a reasonable basis in law and fact to challenge ACIA's overruling of ACC.

---

[6] Appellants cite *Cantu v. Texas Workforce Commission*, in which the Austin Court of Appeals considered whether the evidence was legally sufficient to support the claimants' argument that, even though they lost, they were entitled to fees under section 37.009 because their case served as a catalyst for a governmental agency to change its interpretation of a statute. 145 S.W.3d 236, 244–45 (Tex. App.—Austin 2004, no pet.). Nevertheless, despite reference to the legal-sufficiency standard, the Austin court ultimately held that the trial court did not abuse its discretion by refusing to award fees.

Although consideration of evidence presented by parties may certainly be part of the trial court's consideration in determining the equity and justness of section 37.009 fees, the court also considers all circumstances of the case. Because the trial court may consider matters outside the summary-judgment record, this is not an element for which the summary-judgment movant need present conclusive evidence.

- The issues involved were complicated, as shown by the trial court's twice granting continuances of the motion for summary judgment to allow for additional discovery. In its January 9, 2012 supplemental motion for summary judgment containing purported assignments of ACC's authority to ACIA, ACIA stated that the assignments had been unknown but recently found. Appellants cannot be held responsible for knowing or anticipating the contents of assignments ACIA located late in the pretrial stage of litigation. Thus, any award of fees should be based on fees ACIA incurred after January 9, 2012, and because ACIA's attorney's fees affidavit includes fees only through August 2011, ACIA is not entitled to any fees.

Appellants raised, and presented evidence supporting, these issues for the first time in their post-summary-judgment motion entitled, "Motion for Rehearing/Motion to Reconsider/Motion for Clarification/Motion for New Trial." Assuming without deciding that appellants could raise new arguments regarding why an award of attorney's fees was not equitable and just after the trial court had already awarded the fees, we nevertheless disagree that these facts establish the trial court abused its discretion by awarding the fees. First, the reasonableness and necessity of the amount of fees is not in question—appellants have not challenged these fact issues. Thus, for our purposes, the amount of fees awarded is reasonable and necessary.

Second, the trial court was not required to view appellants' decision to bring suit against ACIA as a benefit to all property owners. Instead, the trial court could have believed appellants' decision to bring ACIA into a feud between neighbors needlessly expended time and ACIA's resources.

Third, in its 2012 suit against the Joneses, ACIA seeks injunctive relief ordering the Joneses to complete their modifications upon written approval from ACC. However, ACIA also alleges the Joneses' current modification does not comply with the relevant restrictive covenants and the Joneses have disregarded ACIA's numerous requests to bring their property into compliance. Hence, in this

separate suit, ACIA is not conceding that ACC has final authority to approve or disapprove architectural-modification applications. The trial court could have viewed ACIA's decision to withhold ruling on the Joneses' requests until after the underlying suit is resolved as an exercise in prudence, not an admission that ACC may have final architectural control authority.

Fourth, the fact that ACIA discovered the assignments late in the pretrial proceedings does not automatically render it unjust to assess fees against appellants. Appellants contend they should not be held responsible for ACIA's fees incurred prior to production of the assignments because appellants obviously did not know during that period what the assignments contained. Nevertheless, even after the assignments were produced, appellants maintained that ACC never assigned its power to ACIA or, even if it did, ACIA reassigned this power to ACC. Hence, the trial court could have reasonably believed ACIA's production of the assignments had no effect on appellants' position in this litigation.

Appellants next contend that the trial court applied an incorrect standard in awarding fees. In its summary-judgment order, the trial court awarded ACIA $120,196.14 "for its reasonable and necessary attorney's fees incurred in defending against [appellants'] declaratory judgment action." Appellants argue that the trial court made "no reference to any guiding principles or law nor [did] it make any findings that an award of attorneys fees here was just and equitable." We reject this argument. As noted above, whether fees are equitable and just are not fact issues and thus not subject to being memorialized in findings of fact. Moreover, appellants cite no authority for the proposition that the trial court was required to recite in its order that the fees award is "equitable and just." In its motion for summary judgment, section 37.009 was the only basis ACIA cited for an award of fees, and ACIA quoted the "equitable and just" requirement. Accordingly, we

20

assume the trial court followed the requirements of section 37.009, including determining the amount of fees awarded was equitable and just.

Finally, appellants argue that the trial court's award of fees to ACIA violates the Open Courts provision of the Texas Constitution. Tex. Const. art. 1, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."). The Open Courts provision includes three separate constitutional rights: (1) courts must actually be available and operational; (2) the Legislature cannot impede access to the courts through unreasonable financial barriers; and (3) meaningful remedies must be afforded, so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress. *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996).

Appellants contend the court's award will "have a stifling effect on the ability of homeowners to question arbitrary and capricious actions taken by their community association . . . [and will] create a fear that even though a litigant has a good faith belief in bringing a cause of action they will be punished for the same if the other side simply incurs attorney's fees." At its core, appellants' complaint is about the trial court's decision to award fees in this case, not a statute that hinders appellants' access to court. Appellants have not cited authority indicating judicial action, as opposed to legislation, may violate the Open Courts provision. Presuming without deciding that judicial action may violate the Open Courts provision, we disagree that the trial court's award of attorney's fees in this case will have a stifling affect on homeowners' declaratory actions against community associations. A trial court's discretionary choice of whether to award fees under section 37.009 is based on the specific facts and circumstances of each case. Thus,

homeowners considering legal action should weigh the potential merits and equities of their own unique claims against the possibility of being held liable for their opponents' attorney's fees and not base the decision solely on the trial court's award of fees in this isolated case. We reject appellants' Open Courts complaint.

In sum, taking as true that the trial court's $120,196.14 award of attorney's fees was reasonable and necessary, appellants have not directed us to any circumstances proving that the trial court abused its discretion by determining it was equitable and just to award ACIA its reasonable and necessary fees. *See Chambers v. First United Bank & Trust Co.*, No. 02-11-00047-CV, 2012 WL 1556091, at *12 (Tex. App.—Fort Worth May 3, 2012, no pet.) (mem. op.) (concluding circumstances supported trial court's decision that award of fees under section 37.009 against losing parties was equitable and just). Accordingly, we overrule appellant's second issue.

We affirm the trial court's judgment.


/s/     John Donovan
        Justice



Panel consists of Chief Justice Frost and Justices Boyce and Donovan.

22